Joel E. Elkins (SBN 256020)
Email: jelkins@weisslawllp.com
**WEISSLAW LLP**
9107 Wilshire Blvd, Suite 450
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile: 310/209-2348

*Attorneys for Plaintiff*

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL PARSHALL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CU BANCORP, DAVID RAINER, ROBERTO BARRAGAN, CHARLES R. BEAUREGARD, KENNETH J. COSGROVE, DAVID C. HOLMAN, K. BRIAN HORTON, ERIC KENTOR, JEFFREY J. LEITZINGER, ROY SALTER, DANIEL SELLECK, CHARLES SWEETMAN, KAVEH VARJAVAND, and PACWEST BANCORP,<br><br>Defendants. | Case No. _____<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>JURY TRIAL DEMANDED |

Plaintiff, by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

## SUMMARY OF THE ACTION

1. This is a class action brought on behalf of the public stockholders of CU Bancorp ("CU Bancorp" or the "Company") against CU Bancorp and its Board

1
COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

of Directors (the "Board" or the "Individual Defendants"), to enjoin a proposed transaction announced on April 5, 2017 (the "Proposed Transaction"), pursuant to which CU Bancorp will be acquired by PacWest Bancorp ("PacWest").

2. On April 5, 2017, the Board caused CU Bancorp to enter into an agreement and plan of merger (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, stockholders of CU Bancorp will receive $12.00 per share in cash and 0.5308 of a share of PacWest common stock.

3. On May 26, 2017, defendants filed a Form S-4 Registration Statement (the "Registration Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Registration Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial

2
COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

1 portion of the transactions and wrongs complained of herein occurred in this
2 District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of CU Bancorp common stock.

9. Defendant CU Bancorp is a California corporation and maintains its principal executive offices at 818 W. 7th Street, Suite 220, Los Angeles, California 90017. CU Bancorp's common stock is traded on the NasdaqCM under the ticker symbol "CUNB."

10. Defendant David Rainer ("Rainer") is the Chairman of the Board and Chief Executive Officer ("CEO") of CU Bancorp.

11. Defendant Roberto Barragan ("Barragan") is a director of CU Bancorp.

12. Defendant Charles R. Beauregard ("Beauregard") is a director of CU Bancorp.

13. Defendant Kenneth J. Cosgrove ("Cosgrove") is a director of CU Bancorp.

14. Defendant David C. Holman ("Holman") is a director of CU Bancorp.

15. Defendant Brian Horton ("Horton") is a director of CU Bancorp.

16. Defendant Eric S. Kentor ("Kentor") is a director of CU Bancorp.

17. Defendant Jeffrey J. Leitzinger ("Leitzinger") is a director of CU Bancorp.

18. Defendant Roy Salter ("Salter") is a director of CU Bancorp.

19. Defendant Daniel Selleck ("Selleck") is a director of CU Bancorp.

20. Defendant Charles Sweetman ("Sweetman") is a director of CU

Bancorp.

21. Defendant Kaveh Varjavand ("Varjavand") is a director of CU Bancorp.

22. The defendants identified in paragraphs 10 through 21 are collectively referred to herein as the "Individual Defendants."

23. Defendant PacWest is a Delaware corporation with its corporate headquarters located at 9701 Wilshire Boulevard, Suite 700, Beverly Hills, California 90067.

## CLASS ACTION ALLEGATIONS

24. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of CU Bancorp (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

25. This action is properly maintainable as a class action.

26. The Class is so numerous that joinder of all members is impracticable. As of April 4, 2017, there were approximately 17,834,183 shares of CU Bancorp common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

27. Questions of law and fact are common to the Class, including, among others, whether defendants violated the 1934 Act and whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

28. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same

interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

29. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

30. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

**A.     Background of the Company and the Proposed Transaction**

31. CU Bancorp is the holding company for California United Bank.

32. California United Bank was established in 2005 and is a leading edge community-based commercial bank, focusing on products and services to customers located throughout the metropolitan Los Angeles, Ventura, Orange, and San Bernardino County markets. California United Bank operates an additional ten full service offices in Encino, the Conejo Valley, West Los Angeles, the Santa Clarita Valley, the Simi Valley, Irvine, Anaheim, Irvine/Newport Beach, the Inland Empire, and the South Bay.

33. On January 26, 2017, CU Bancorp issued a press release wherein it reported record financial results for the fourth quarter and full year 2016. The Company reported that net income in 2016 was $27.5 million, up 29% from the

prior year, and net income for fourth quarter 2016 was $7.2 million, up 30% from the year-ago quarter. Net interest income increased $2.2 million or 10% compared to the fourth quarter of 2015. Tangible book value per share increased $1.43 per share or 11% to $14.10 from the prior year. Total assets increased $360 million to $3 billion, up 14% from the prior year. Total deposits increased $321 million to $2.6 billion, up 14% from the prior year. Additionally, total loans increased $217 million to $2.1 billion, up 12% from the prior year. With respect to the results, Individual Defendant Rainer commented:

> 2016 was another year of strong financial performance for the Company[.] Our return on average tangible common equity increased to more than 11%, return on average assets increased to 0.92% and our efficiency ratio was 58%. Momentum was maintained throughout the year, with fourth quarter 2016 performance resulting in net income and diluted earnings per share each up 30% over the year-ago quarter. This led to record net income in 2016 of $27.5 million and diluted earnings per share of $1.50, an increase of 29% and 27%, respectively, from 2015. Activities to enhance BSA Compliance and address the BSA Consent Order resulted in $1.7 million in non-recurring charges, versus our earlier estimate of $2 million.

> As we have done from our inception, we continue to focus on low-cost core deposits, which provide an important part of the value of our franchise. In 2016 CUB's total deposits increased $321 million to $2.6 billion, and I'm pleased to report that even as the prime rate increased in December of 2015 and 2016, our cost of deposits in the fourth quarter remained within 0.01% of the year-ago quarter. Total assets have grown by $730 million in the two years since the merger of CUB and 1st Enterprise, buttressing our commitment to organic growth.

Individual Defendant Horton further commented:

> Year over year, we grew total loans $217 million or 12% to $2.1 billion—surpassing the $2 billion mark for the first time in the Company's history[.] Commercial and industrial loans increased modestly by $3 million while commercial and industrial line of credit commitments increased $34 million from the third quarter of 2016 through new relationships to the Bank. Utilization of commercial and industrial lines of credit decreased from 45% to 40%, of which 2% was due to the increase in commitments and 3% was due to pay downs, reflecting the strong balance sheets of our borrowers. While commercial and industrial lending remains our business banking focus, fourth quarter loan growth came primarily through growth in our portfolio of loans secured by real estate, encompassing most types

of this borrowing category. These are generally loans that have strong guarantors and moderate levels of loan to value. Furthermore, we have historically experienced a low level of charge-offs from real estate secured loans. 2016 again demonstrated our ability to combine growth with discipline in credit underwriting; witnessed by the ratio of non-performing assets to total assets of 0.04%.

34. On April 27, 2017, CU Bancorp issued a press release wherein it reported record first quarter operational results. The Company reported that net income available to common shareholders increased to $7.5 million, compared to $6.3 million in the first quarter of 2016, and total revenue increased 10.4% from the first quarter of 2016. Tangible book value per share increased to $14.52, up $0.42 from prior quarter. Total assets increased to $3.1 billion, up $404 million from the first quarter of 2016 and $149 million from the prior quarter. Total loans increased to $2.0 billion, up $177 million from the first quarter of 2016 and flat from the prior quarter. Additionally, total deposits increased to $2.8 billion, up $379 million or 16% from the first quarter of 2016 and $147 million or 6% from the prior quarter. Moreover, the Company was recognized as a recipient of the 2016 Raymond James Community Bankers Cup and was named as a top 100 best-performing community bank by S&P Global Market Intelligence. With respect to the financial results, Individual Defendant Rainer commented:

> I'm very pleased to report CUB achieved record net income of $7.8 million and diluted earnings per share of $0.42 in the first quarter of 2017[.] Return on average tangible common equity increased to 11.87%, the highest in Company history, and return on average assets of 0.97% marked the second highest in Company history. Total deposits increased by $147 million or 6% over the prior quarter, which amounts to 24% annualized; non-interest bearing deposits remain 54% of total deposits.

35. Nevertheless, the Board caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

36. To the detriment of the Company's stockholders, the terms of the Merger Agreement substantially favor PacWest and are calculated to unreasonably dissuade potential suitors from making competing offers.

37. The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 5.08 of the Merger Agreement states, in relevant part:

> The Company agrees that neither it nor any of its Subsidiaries nor any of their respective officers, directors, employees and Affiliates shall, and that it shall direct and use its reasonable best efforts to cause its and its Subsidiaries' agents and representatives (including any financial advisor, attorney or accountant retained by it or acting on its behalf) not to, directly or indirectly, initiate, solicit, encourage or otherwise facilitate any inquiries or the making of any proposal or offer with respect to an Acquisition Proposal. The Company further agrees that neither it nor any of its Subsidiaries nor any of their respective officers, directors, employees and Affiliates shall, and that it shall direct and use its reasonable best efforts to cause its agents and representatives (including any financial advisor, attorney or accountant retained by it or acting on its behalf) not to, directly or indirectly, engage in any negotiations concerning, or provide any confidential information or data to, or have any discussions with, any Person relating to an Acquisition Proposal, or otherwise facilitate any effort or attempt to make or implement an Acquisition Proposal[.] . . . The Company agrees that it will immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties conducted heretofore with respect to any Acquisition Proposals. The Company agrees that it will take the necessary steps to promptly inform the individuals referred to in the first sentence hereof of the obligations undertaken in this Section 5.08.

38. Further, the Company must promptly advise PacWest of any proposals or inquiries received from other parties. Section 5.08 of the Merger Agreement states, in relevant part:

The Company agrees that it will notify Parent promptly, but in no event later than the next succeeding Business Day, if any such inquiries, proposals or offers are received by, any such information is requested from, or any such discussions or negotiations are sought to be initiated or continued with, any of its representatives, indicating, in connection with such notice, the name of such Person and the material terms and conditions of any proposal or offer and thereafter shall keep Parent informed, on a current basis, of the status and terms of any such proposals or offers and the status of any such discussions or negotiations.

39. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants PacWest a "matching right" with respect to any "Superior Proposal" made to the Company. Section 5.06 of the Merger Agreement provides, in relevant part:

(ii) Notwithstanding anything to the contrary set forth in this Agreement, prior to the time, but not after, the Company Shareholder Approval contemplated by this Agreement is obtained, the Company Board may withhold, withdraw or adversely modify the Company Board Recommendation or approve, recommend or otherwise declare advisable any Superior Proposal made to the Company after the date hereof that was not solicited, initiated, encouraged or facilitated in breach of this Agreement, if (A) an unsolicited bona fide written offer is made to the Company and is not withdrawn and the Company Board determines in good faith (after consultation with its financial advisor) that such Acquisition Proposal is a Superior Proposal, and (B) the Company Board determines in good faith, after consultation with outside counsel, that the failure to take such action would result in a violation of the directors' fiduciary duties under applicable Law; provided, however, that no such Company Change of Recommendation may be made until after (I) at least five (5) Business Days following Parent's receipt of notice from the Company advising that the Company Board intends to take such action and the basis therefor, including all necessary information under Section 5.08 and (II) the Company has negotiated in good faith to permit Parent to modify this Agreement during such five (5) Business Day period. In determining whether to make a Company Change of Recommendation, the Company Board shall take into account any changes to the terms of this Agreement proposed by Parent and any other information provided by Parent in response to such notice. Any material amendment to any Acquisition Proposal will be deemed to be a new Acquisition Proposal for purposes of this Section 5.06, including with respect to the notice period referred to in this Section 5.06.

40. Further locking up control of the Company in favor of PacWest, the Merger Agreement provides for a "termination fee" of $26.5 million, payable by the Company to PacWest if the Individual Defendants cause the Company to terminate the Merger Agreement.

41. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

42. Additionally, the Individual Defendants have entered into voting agreements, pursuant to which they have agreed to vote their Company shares in favor of the Proposed Transaction. Accordingly, such shares are already locked up in favor of the merger.

43. The consideration to be paid to plaintiff and the Class in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

44. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

45. Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

46. For example, PacWest entered into consulting agreements with Individual Defendants Rainer and Horton, as well as Karen Schoenbaum, Executive Vice President and Chief Financial Officer of CU Bancorp, pursuant to which PacWest will retain them as consultants following the close of the Proposed Transaction.

10
COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

*The Registration Statement Omits Material Information, Rendering It False and Misleading*

47. Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction.

48. The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading.

49. First, the Registration Statement omits material information regarding CU Bancorp's financial projections, PacWest's financial projections, and the analyses performed by the Company's financial advisor, Keefe, Bruyette & Woods, Inc. ("KBW"), in support of its so-called fairness opinion.

50. The Registration Statement fails to disclose CU Bancorp's financial projections.

51. Similarly, the Registration Statement fails to disclose PacWest's financial projections.

52. With respect to KBW's *CUB Discounted Cash Flow Analysis*, the Registration Statement fails to disclose: (i) the estimated excess cash flows that CU Bancorp could generate from 2017 to 2021; (ii) the implied terminal value of CU Bancorp; (iii) the assumed long-term earnings and asset growth rates of CU Bancorp; and (iv) the inputs and assumptions underlying the discount rate range of 9.0% to 13.0%.

53. With respect to KBW's *Forecasted Pro Forma Financial Impact Analysis*, the Registration Statement fails to disclose: (i) the closing balance sheet estimates as of December 31, 2017 for CU Bancorp and PacWest; (ii) the assumed long-term earnings growth rates and pro forma assumptions provided by PacWest

management; and (iii) the projected financial results of PacWest as used in the analysis, including assets, growth loans, deposits, tangible common equity, earnings per share, and tangible book value per share.

54. With respect to KBW's *Relative Contribution Analysis*, the Registration Statement fails to disclose the balance sheet and net income data for CU Bancorp and PacWest as of December 31, 2016 as used by KBW in the analysis.

55. With respect to KBW's *CUB Comparable Companies Analyses* and *PacWest Comparable Companies Analysis*, the Registration Statement fails to disclose the individual multiples and financial metrics for the companies observed by KBW in the analyses.

56. With respect to KBW's *Comparable M&A Transactions Analysis*, the Registration Statement fails to disclose the individual multiples and financial metrics for the transactions observed by KBW in the analysis.

57. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

58. The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement:  (i) "Background of the Merger"; (ii) "Recommendation of

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

the CUB Board of Directors and Reasons for the Merger"; and (iii) "Opinion of CUB's Financial Advisor."

59. Second, the Registration Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

60. Specifically, the Registration Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of CU Bancorp's officers and directors, particularly who participated in all such communications.

61. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

62. The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Background of the Merger"; (ii) "Recommendation of the CUB Board of Directors and Reasons for the Merger"; and (iii) "Interests of CUB Directors and Executive Officers in the Merger."

63. Third, the Registration Statement omits material information regarding the background of the Proposed Transaction. The Company's stockholders are entitled to an accurate description of the process the directors used in coming to their decision to support the Proposed Transaction.

64. For example, the Registration Statement fails to disclose the number of financial institutions identified by KBW as potential merger partners in

November 2016, as well as the number of potential bidders contacted by the Company or KBW between November 2016 and February 2017.

65. Additionally, the Registration Statement fails to disclose "CUB's purchase price expectation to consummate a transaction" as discussed between KBW and Individual Defendant Rainer in February 2017.

66. The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Background of the Merger"; and (ii) "Recommendation of the CUB Board of Directors and Reasons for the Merger."

67. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to CU Bancorp's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and CU Bancorp**

68. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

69. The Individual Defendants disseminated the false and misleading Registration Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. CU Bancorp is liable as the issuer of these statements.

70. The Registration Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty

to disclose this information in the Registration Statement.

71. The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

72. The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to stockholders.

73. The Registration Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

74. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

75. Because of the false and misleading statements in the Registration Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act Against the Individual Defendants and PacWest

76. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

77. The Individual Defendants and PacWest acted as controlling persons of CU Bancorp within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of CU Bancorp and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or

indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

78. Each of the Individual Defendants and PacWest was provided with or had unlimited access to copies of the Registration Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

79. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Registration Statement.

80. PacWest also had direct supervisory control over the composition of the Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement.

81. By virtue of the foregoing, the Individual Defendants and PacWest violated Section 20(a) of the 1934 Act.

82. As set forth above, the Individual Defendants and PacWest had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with

irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.  Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.  In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.  Directing the Individual Defendants to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.  Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.  Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.  Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: June 9, 2017

WEISSLAW LLP

By: /s/ Joel E. Elkins
Joel E. Elkins (SBN 256020)
9107 Wilshire Blvd, Suite 450
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile: 310/209-2348
Email: jelkins@weisslawllp.com

*Attorneys for Plaintiff*

OF COUNSEL:

**RIGRODSKY & LONG, P.A.**
Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310

**RM LAW, P.C.**
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
(484) 324-6800

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934